**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ABBOTT LABORATORIES** and **ST. JUDE MEDICAL S.C., INC.**;<br><br>Plaintiffs,<br><br>v.<br><br>**CHAD AMATO**, and **IMPULSE DYNAMICS, USA, INC.**;<br><br>Defendants. | ) | **Case No. __________** |

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiffs Abbott Laboratories and St. Jude Medical S.C., Inc. ("St. Jude") (collectively, "Abbott" or "Plaintiffs"), by and through their attorneys, bring this Complaint for Injunctive and Other Relief against Defendants Chad Amato ("Amato") and Impulse Dynamics USA, Inc. ("Impulse") (collectively, "Defendants"), and allege as follows:

**NATURE OF THE ACTION**

1. Amato is a former Abbott employee who lived and worked in Arizona throughout his 16 years of employment, up until the day of his resignation. Amato was always classified (per information he provided) and paid as an Arizona employee while he worked for Abbott, he signed his Employee Agreement while residing and working in Arizona, and at no point did Amato ever claim to be a California resident.

2. Regardless, on September 1, 2026, Amato resigned from Abbott, immediately joined Abbott's competitor Impulse, claimed that he was a "new resident" of California, told Abbott that he was electing to "nullify" his Employee Agreement under California law, and filed

a preemptive California declaratory judgment action despite the clear Illinois choice of law and forum provisions in his Employee Agreement.

3. At the time of his resignation, Amato was a senior leader in Abbott's Cardiac Rhythm Management ("CRM") business, with responsibility for Abbott's entire West Coast CRM organization. In that role, Amato had access to nonpublic information concerning sales performance, physician and customer needs, competitive conditions, commercialization strategies, recruiting, personnel planning, and future business initiatives. As Abbott would discover after his resignation, while he was *still* employed by Abbott as a senior executive Amato repeatedly transmitted Abbott's confidential and trade secret business information to his personal email accounts, diverted a recruiting opportunity obtained through his Abbott role to Impulse, and retained company property after his resignation.

4. The allegations herein are the tip of the iceberg: Abbott cannot determine the full extent of Amato's conduct with regard to Abbott's information. That is because after he resigned, filed his separate lawsuit in California, and was explicitly told by Abbott ***twice*** not to delete any data on company-owned devices, Amato wiped all of the data from his company-issued iPad before returning it. Amato's willful destruction of evidence of his use of Abbott information is even more concerning because Impulse now employs Amato in a role where his duties overlap substantially with those he performed for Abbott, and where his knowledge of Abbott's confidential information would be invaluable.

5. Abbott now brings this action to address Amato's breaches of his contractual and fiduciary obligations owed to Abbott, his disloyal conduct while serving as a senior Abbott sales executive, his retention and transmission of Abbott's confidential and trade secret information, his destruction of evidence documenting his unlawful retention and transmission of that trade secret

information, and Impulse's interference with Amato's obligations despite having actual knowledge of Amato's written Employee Agreement.

6. Because the full scope of Amato's acquisition, retention, disclosure, and use of Abbott's information remains under investigation and requires expedited forensic discovery, Abbott also seeks immediate injunctive relief requiring the immediate suspension of Amato's work for Impulse and the return and preservation of Abbott's property and information, prohibiting unauthorized use or disclosure of its confidential information and trade secrets, enforcing Amato's valid contractual obligations, and preventing Impulse from inducing or facilitating further breaches. Abbott also seeks damages, disgorgement, attorneys' fees where authorized, costs, and all other available relief.

## PARTIES

7. Plaintiff Abbott Laboratories is organized under the laws of the State of Illinois and has its principal place of business in Abbott Park, Illinois.

8. Plaintiff St. Jude Medical S.C., Inc. is a Minnesota corporation with a place of business at One St. Jude Medical Drive, St. Paul, Minnesota.

9. Abbott Laboratories acquired St. Jude in 2017 and is the parent company of St. Jude. Unless otherwise indicated, references in this Complaint to "Abbott" include Abbott Laboratories and St. Jude. St. Jude is included within the Employee Agreement's definition of "ABBOTT."

10. The Employee Agreement was entered into by Abbott on behalf of itself and its subsidiaries, divisions, units, and affiliates, including St. Jude, and was intended to protect those covered entities. The Employee Agreement also authorizes assignment to an affiliate or successor.

11. Abbott owns or lawfully possesses and protects the property, confidential information, trade secrets, and business goodwill implicated by Defendants' conduct.

12. Defendant Chad Amato is an individual who, according to the allegations he filed in the Central District of California, resides in San Clemente, Orange County, California and is a citizen of California. Before resigning from Abbott and allegedly relocating to California, Amato resided in and worked for Abbott in Arizona. Upon information and belief, Amato is still an Arizona resident.

13. Defendant Impulse Dynamics USA, Inc. is a Delaware corporation with its principal place of business in Marlton, New Jersey.

14. Impulse employed Amato as Vice President of Market Expansion beginning on or about September 1, 2026. The position includes responsibility for developing and leading Impulse's market-expansion strategy and developing and executing go-to-market strategies for new markets and growth opportunities.

**JURISDICTION AND VENUE**

15. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Count IV arises under the Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq. Alternatively, this Court has jurisdiction under 28 U.S.C. § 1332 because Abbott is a citizen of Illinois, St. Jude is a citizen of Minnesota, Amato is an alleged citizen of California, Impulse is a citizen of Delaware and New Jersey, and the amount in controversy exceeds $75,000, exclusive of interest and costs. The value of Abbott's confidential information, contractual rights, property, goodwill, business opportunities, and requested injunctive relief exceeds $75,000.

16. This Court has supplemental jurisdiction over Abbott's related state-law claims under 28 U.S.C. § 1367 because those claims form part of the same case or controversy.

17. An actual and immediate controversy exists concerning the validity, applicability, enforceability, and breach of Amato's Employee Agreement. Amato and Impulse have filed an action in California seeking to invalidate or preclude enforcement of specified provisions, while Abbott maintains that the applicable provisions are valid, enforceable, and presently being violated.

18. Section 16 of the Employee Agreement provides that Abbott and Amato agreed to the exclusive jurisdiction of the state and federal courts in Illinois in any action or proceeding arising out of or relating to the Employee Agreement and irrevocably agree that all claims in such an action or proceeding shall be heard and determined in Lake County, Illinois state court or the Northern District of Illinois federal court. Amato stipulated and consented to Illinois personal jurisdiction and waived objections to jurisdiction, venue, and inconvenient forum.

19. At the time Amato entered into the Employee Agreement, he did not primarily reside in California and did not primarily work in California. Accordingly, California Labor Code § 925 does not apply to the Employee Agreement.

20. This Court has personal jurisdiction over Impulse pursuant to 735 ILCS 5/2-209 and the United States Constitution because Impulse knowingly interfered with an Illinois-governed contractual relationship, received actual notice of Amato's Illinois-governed Employee Agreement, misappropriated trade secrets maintained and located at Abbott's headquarters in Illinois, and induced or facilitated breaches causing injury to Abbott in Illinois.

21. Venue is proper in this District under 28 U.S.C. § 1391 and Section 16 of the Employee Agreement, which expressly identifies the Northern District of Illinois as an exclusive forum for claims arising out of or relating to the Employee Agreement.

22. Assignment to the Eastern Division is proper because the Employee Agreement designates Lake County, Illinois, as the exclusive venue for state-court proceedings arising out of or relating to the Employee Agreement and designates the Northern District of Illinois as the exclusive federal forum. Lake County lies within the Eastern Division of the Northern District of Illinois.

## EVENTS GIVING RISE TO THIS ACTION

### THE CARDIAC RHYTHM MANAGEMENT MARKET AND ABBOTT'S BUSINESS

23. Abbott is among the leaders in medical devices related to CRM, including devices that use electrical pulses to treat improperly beating hearts and other cardiac conditions.

24. Abbott manufactures and sells CRM devices to physicians, hospitals, clinics, and other healthcare professionals and institutions. CRM products are a subset of implantable medical devices designed to address heart-rhythm problems, including arrhythmia, bradycardia, and tachycardia. CRM products include implantable pacemakers, implantable cardiac loop recorders, and implantable cardioverter defibrillators, among other devices.

25. The CRM market is extremely competitive. CRM devices are technologically complex, requiring CRM sales and commercial professionals to possess technical knowledge and understand the clinical application of the devices.

26. CRM sales and leadership personnel have responsibilities that extend far beyond sales. CRM personnel work with implanting physicians and their staff to provide training and education regarding devices, and healthcare professionals rely on CRM personnel's technical expertise regarding the products.

27. CRM personnel also assist healthcare professionals during implant procedures, support device programming to optimize clinical benefit, and follow up after procedures to help monitor devices and provide other device support.

28. Establishing and maintaining customer relationships and goodwill is an important part of Abbott's CRM business. Abbott devotes substantial resources to training and developing CRM personnel and to ensuring that they acquire the technical and commercial skills necessary to serve customers and support the business, a process that can take years.

29. Abbott has invested substantial time and resources developing relationships and goodwill with physicians, hospitals, healthcare systems, and other customers throughout Amato's former territory. Amato cultivated and strengthened those relationships while acting on Abbott's behalf and through the access, training, resources, and goodwill Abbott provided.

30. Abbott's investment in CRM personnel, customer relationships, confidential information, and trade secrets provides important competitive advantages in the CRM market.

**ABBOTT'S CONFIDENTIAL INFORMATION AND TRADE SECRETS**

31. In the course of operating its CRM business, Abbott develops and compiles confidential information and trade secrets concerning, among other things:

a. current and historical revenue, unit volumes, growth, decline, forecasts, and sales performance;

b. product launch, market entry, product adoption, and commercialization strategies;

c. customer, physician, hospital, and account needs, preferences, utilization, and purchasing patterns;

d. confidential pricing, rebate, positioning, segmentation, channel, and competitive analyses;

e. physician training, field certification, deployment, and support strategies;

f. budgets, headcount, expenses, compensation, and financial plans;

g. personnel, succession planning, recruiting, leadership development, employee identity, performance, compensation, and skill;

h. developmental products, research and development information, clinical and technical data, and future business plans; and

i. proprietary compilations and analyses derived from nonpublic commercial, financial, personnel, and operational data.

32. This information is valuable because it permits Abbott to identify market opportunities, allocate resources, develop commercial strategies, support physicians and customers, evaluate competitive conditions, plan product introductions, recruit and retain personnel, improve execution, and protect its market position.

33. A competitor possessing this information could avoid substantial time and expense, identify Abbott's strengths and vulnerabilities, strategically underbid Abbott, target customers, personnel, or business opportunities more efficiently, anticipate commercial initiatives, and tailor its own strategy using Abbott's work.

34. Abbott invests substantial resources to protect confidential and trade-secret information, including through appropriate security systems for physical offices and electronic databases, restricted and password-protected systems, technology designed to protect data integrity, and monitoring for unauthorized access, intrusion, and dissemination.

35. Abbott maintains policies requiring employees to take precautions against unauthorized access and prohibiting unauthorized disclosure to third parties.

36. Abbott limits access to confidential information to employees with a business need for it. Confidential commercial information is maintained in secure locations and is not made broadly available to employees whose responsibilities do not require access.

37. Employees with access to confidential information are required to acknowledge its existence and importance, agree not to use or disclose it except as required and authorized within the scope of their employment, and, where applicable, accept reasonable post-employment restrictions designed to prevent unfair competition involving that information.

38. Abbott also uses contractual confidentiality protections with customers and other third parties where appropriate.

39. Abbott does not make its confidential commercial information and trade secrets generally available to competitors or the public.

40. Abbott derives actual or potential independent economic value from the fact that its trade secrets are not generally known and are not readily ascertainable by proper means.

**AMATO'S EMPLOYMENT AND SENIOR RESPONSIBILITIES**

41. Amato began working in Abbott's CRM and electrophysiology sales organization in or about April 2010. At the time he was hired, and at every time thereafter during his employment with Abbott, Amato represented that he was a resident of Arizona and directed Abbott to withhold Arizona employment taxes based on his residence there.

42. Over the course of his 16 years of employment with Abbott, Amato advanced to a senior position. In January 2019, Amato was promoted to Area Vice President ("AVP") for the West Coast Area of the CRM Division. By May 2020, Amato held the title AVP, CRM.

43. Amato managed seven Regional Sales Directors and was responsible for a region consisting of Arizona, Oregon, Washington, Hawaii, Nevada, Utah, Wyoming, Montana, Alaska, California, and Idaho.

44. In his senior AVP role, Amato led Abbott's West Coast CRM business and had significant responsibilities involving commercial strategy, revenue growth, product adoption, physician engagement and training, field certification and execution, expenses, headcount, personnel deployment, recruiting, leadership development, and succession planning.

45. Amato occupied a position of trust and confidence and received access to confidential information because he needed it to perform his duties for Abbott.

46. Amato's senior AVP role placed him in a position to understand Abbott's historical and current performance, future plans, commercial priorities, personnel strengths, market opportunities, customer relationships, and competitive vulnerabilities.

47. Through his employment, Amato also received substantial training, business contacts, and access to customer and physician relationships developed and maintained through Abbott's investment and goodwill.

**AMATO'S EMPLOYEE AGREEMENT**

48. In consideration of his employment and access to confidential and trade secret information protected for the benefit of Abbott, Amato entered into an Employee Agreement with Abbott. The Employee Agreement contains confidentiality, return of property, nonsolicitation, noncompetition, notification, cooperation, choice of law, forum selection, and equitable-relief provisions designed to protect the confidential information, workforce, goodwill, and legitimate business and competitive interests of Abbott.

49. Amato executed the Employee Agreement on February 8, 2018. Abbott Laboratories entered the Employee Agreement on behalf of itself and its subsidiaries, divisions, units, and affiliates, collectively defined as "ABBOTT," including St. Jude. A true and correct copy is attached as **Exhibit A**.

50. The Employee Agreement states that, in consideration of its execution, the parties' mutual promises and covenants, and Amato's employment, Amato would receive access to Abbott Confidential Information, customers, business contacts, and training.

51. The Employee Agreement defines "Competing Business" as any person or organization engaged in, or planning to become engaged in, a business involving a "Competing Product."

52. The Employee Agreement defines "Competing Product" as any product, process, technology, machine, invention, or service, existing or under development, that has or will have the same or a similar purpose or use as an existing or developmental product, process, technology, machine, invention, or service researched, discovered, developed, manufactured, imported, marketed, sold, offered for sale, or used by Abbott.

53. The Employee Agreement defines "Confidential Information" to include nonpublic research and development data, clinical and technical data, marketing, pricing and sales information, customer and prospective-customer information, business practices and strategies, marketing plans, financial and operational data, plans, personnel data, trade secrets, intellectual property, proprietary information, and confidential compilations.

54. Section 6 requires Amato, before terminating employment or upon Abbott's request, to return all Abbott property and prohibits him from retaining copies, reproductions, abstracts, or summaries.

55. Section 8 requires Amato to use best efforts to protect the secrecy and confidentiality of Confidential Information and prohibits unauthorized use or disclosure during or after employment.

56. Section 9 prohibits Amato, during employment and for twelve months after termination, from providing services to a Competing Business where the services are the same as or similar in function or purpose to services he provided Abbott during his final two years of employment or are otherwise likely to result in the use or disclosure of Confidential Information.

57. Section 9 also prohibits specified activities involving a Competing Product, Abbott Customers, and Covered Suppliers.

58. Section 10 prohibits specified solicitation of Abbott employees, independent contractors, and partners during employment and for twenty-four months after termination.

59. Section 11 provides for injunctive relief, extension of restricted periods, damages, attorneys' fees, costs, and expenses reasonably incurred in enforcement.

60. Section 11(d) provides that "ABBOTT will face irreparable injury which may not be reasonably possible to calculate in dollar terms" and that "ABBOTT shall be entitled to injunctions enjoining such breach or threatened breach."

61. Sections 13(a) through 13(d) impose obligations concerning notice to subsequent employers, notice to Abbott, provision of information needed to evaluate competitive employment, clarification, and pre-litigation written resolution.

62. Section 14 authorizes modification and severability.

63. Section 15 provides that Illinois law governs.

64. Section 16 provides for exclusive jurisdiction in Illinois.

65. Amato repeatedly acknowledged his Employee Agreement obligations, and most recently on July 30, 2026.

66. Abbott performed its obligations, employed and compensated Amato, and provided access to Confidential Information, training, customers, business contacts, and relationships necessary for his work.

**AMATO'S TRANSMISSION AND RETENTION OF ABBOTT INFORMATION DURING EMPLOYMENT**

67. Prior to his resignation from Abbott, Amato sent several documents containing highly confidential Abbott information to a personal email account. Amato had no right to do so, and Abbott employees are instructed *not* to send confidential materials to such personal devices or accounts.

68. On November 25, 2025, Amato forwarded to a personal email account a presentation containing revenue units and year-over-year growth or decline information for 2023 and 2024.

69. On December 31, 2025, Amato sent to himself West Coast Area 2025 year-end performance statistics.

70. The information described above was obtained through Amato's employment and access to Abbott's systems, and has not been returned to Abbott.

71. Abbott did not authorize Amato to retain its confidential information for use after his employment or for the benefit of Impulse or any other third party.

72. Abbott's forensic investigation remains ongoing. As a result, the full scope of Amato's transmissions to personal accounts, retention of company information, downloads, copying, deletion activity, and any subsequent access, use, or disclosure are unknown.

73. On the Friday before his resignation, Amato contacted an Abbott product development employee and requested that this employee provide him with a PowerPoint containing Abbott CRM's new product launch schedule for the next several years. That employee declined to do so, but Amato had no legitimate business reason to ask for such information, and especially not on the eve of his resignation.

74. In reviewing Amato's use of company electronic accounts after his resignation, Abbott also reviewed Amato's use of Abbott's Power BI system, where highly confidential sales and customer information is stored and available to certain employees. Abbott's review showed that Amato's Power BI usage increased by an astounding 44% in the 30 days prior to his resignation.

**AMATO'S UNDISCLOSED TRANSITION TO IMPULSE**

75. In June 2026, Amato represented to Abbott that he intended to retire on or about January 4, 2027. In July 2026, Amato further represented to Abbott's CRM Senior Vice President that he intended to remain employed through the end of 2027. Abbott reasonably relied on those representations in planning for future leadership and personnel needs.

76. Despite those representations, Amato began communicating with Impulse regarding potential employment soon thereafter.

77. On August 3, 2026, Amato sent his Employee Agreement from his Abbott email account to Ryan Walters at Impulse. Amato's email stated: "Attached is my EA with Abbott. Let me know if you need anything else."

78. Impulse therefore possessed actual notice of the Employee Agreement and its restrictions before Amato's employment began.

79. On August 12, 2026, Amato was invited to or participated in an "Intro Meeting" with Ryan Walters and Jason Spees of Impulse.

80. On August 18, 2026, Amato forwarded to a personal account the August 3 email thread concerning his Employee Agreement and added "FYI."

81. On August 24, 2026, while still employed by Abbott, Amato forwarded to Doug Nock at Impulse the resume of a potential candidate who had contacted Amato regarding Abbott opportunities.

82. Upon information and belief, Amato used Abbott's time, systems, access, information, or relationships to further his transition to Impulse while continuing to owe duties of loyalty to Abbott.

**AMATO'S RESIGNATION, CALIFORNIA FILING, AND NEW IMPULSE ROLE**

83. On September 1, 2026, Amato submitted his notice of resignation. Amato's initial notice provided approximately two weeks' notice.

84. After a discussion with Abbott concerning the potential competitive relationship between Abbott and Impulse, Amato contacted Abbott and stated that he was now making his resignation immediately effective.

85. The same day, September 1, 2026, Amato began employment with Impulse.

86. On the same day that he resigned from his employment at Abbott and joined Impulse, Amato and Impulse filed a lawsuit in California federal court, seeking declaratory and injunctive relief against enforcement of Sections 9, 10, 13, 15, and 16 of the Employee Agreement. In that lawsuit, Defendants claimed that Amato was a "new resident" of California and that the restrictions in his Employee Agreement were void under California law.

87. On the same day they filed their California action, counsel for Amato and Impulse notified Abbott of the California action, asserted that the challenged provisions were void, and demanded that Abbott agree not to enforce them by September 3.

88. The coordinated timing of Amato's pre-resignation communications with Impulse, transmission of his Employee Agreement to Impulse, meetings with Impulse personnel and counsel, commencement of employment with Impulse, and filing of the California action reflects a coordinated effort to position Amato to challenge and avoid his contractual obligations while limiting Abbott's ability to investigate the circumstances of his departure and transition to Impulse.

89. Despite their actions, Abbott reached out to Defendants to try and understand what exactly Amato's role at Impulse would be, so that Abbott could determine if it was competitive. On September 3, 2026, Impulse's counsel represented that Amato's territory was California, his product bag was "currently, none," and he was learning about Impulse's Cardiac Contractility Modulation device. Abbott asked that Defendants provide a written job description for Amato's new role.

90. The next day, Impulse provided a written job description for Amato's new role as Vice President of Market Expansion, with decidedly *different* responsibilities than those that were provided just the day before. That new job description claimed that Amato would have responsibility for developing Impulse's market-expansion strategy; identifying geographic markets, customer segments, clinical applications, and channels; evaluating competitive dynamics and customer needs; developing business cases and key performance indicators; executing go-to-market strategy; partnering on segmentation, positioning, and pricing; expanding use in existing accounts; and delivering sales targets. Amato, through his counsel, also disclosed to Abbott that he had already begun contacting customers to announce his new role at Impulse.

91. Amato's Impulse role requires him to perform commercial functions that are the same as or similar in function or purpose to services he provided Abbott during his final two years of employment. At Abbott, Amato led the West Coast CRM business and was responsible for commercial strategy, revenue growth, product adoption, physician engagement and training, field execution, personnel deployment, recruiting, leadership development, and succession planning. At Impulse, he is responsible for market-expansion strategy, geographic and customer segmentation, competitive analysis, customer-needs assessment, business cases, go-to-market execution, positioning, pricing, existing-account expansion, and sales targets.

92. Impulse markets and sells Cardiac Contractility Modulation ("CCM") devices designed to strengthen the heart's pumping strength to treat heart failure. Upon information and belief, Impulse is also developing additional CCM products and technologies, including the CCM-D system.

93. Publicly available information describes CCM-D as a device that combines Impulse's CCM therapy with implantable cardioverter defibrillator ("ICD") functionality in a single implantable device. Upon information and belief, CCM-D has or is expected to have the same or a similar purpose or use as certain of Abbott's existing or developmental CRM technologies, products, and therapies and is expected to compete with, or otherwise have substantial competitive overlap with, Abbott's CRM business, physician relationships, customer base, and commercial markets.

94. Impulse is thus a "Competing Business" under the Employee Agreement because it is engaged in or planning to become engaged in a business involving a "Competing Product."

95. Abbott is informed and believes that as early as August 3, 2026, while still employed by Abbott, Amato was communicating with Impulse in connection with his anticipated

transition to Impulse. At 12:01 p.m. that day, using his Abbott email account, Amato sent his Employee Agreement to Ryan Walters at Impulse and stated: "Attached is my EA with Abbott. Let me know if you need anything else."

96. Abbott is informed and believes that on August 12, 2026, while still employed by Abbott, Amato participated in an "Intro Meeting" with Impulse personnel concerning his anticipated role with Impulse. Abbott's investigation has further identified evidence that those communications involved discussion of Impulse's CCM-D system, including anticipated market opportunities, commercialization efforts, launch timing, and growth initiatives relating to CCM-D.

97. While secretly pursuing employment with Impulse, and while he was *still* employed by Abbott, Amato began furthering Impulse's business interests. Among other things, Amato engaged in communications with Impulse regarding prospective employment and forwarded to an Impulse representative the resume of a potential candidate who had contacted him regarding opportunities with Abbott.

98. Amato's Impulse duties directly concern categories of Confidential Information known to him, including marketing, pricing, sales, customer, business strategy, financial, operational, personnel, and planning information.

99. By accepting and performing services for Impulse that are likely to result in the use or disclosure of Confidential Information, Amato is independently and presently violating Section 9(a)(ii).

100. Abbott has not provided the advance written authorization required by Section 9 of the Employee Agreement.

## DEVICE ACCESS, COMPANY PROPERTY, AND POST-RESIGNATION CONDUCT

101. On September 1, 2026, after he provided notice of his resignation, Abbott instructed Amato not to access or alter company devices.

102. Notwithstanding Abbott's instructions, an internal record indicates that Amato was accessing his company-issued laptop anyway. Abbott IT locked the device shortly thereafter to prevent Amato from further accessing it.

103. On September 2, 2026, Abbott provided Amato with a window during which a courier would retrieve his company-issued iPad, laptop, and phone.

104. Amato at first claimed that the iPad was "not in his possession." When pressed to explain where, exactly, his company-issued iPad was located, Amato refused to answer and instead directed Abbott to his counsel.

105. Abbott again explicitly instructed Amato not to further tamper with the devices by accessing them or otherwise.

106. Eventually, Amato claimed (through his counsel) that his iPad was in a moving box and that he needed to find it before returning it. Amato did eventually return the company-issued iPad to Abbott. However after the iPad was forensically imaged and inspected, Abbott discovered that it had been "factory reset" and had all user data wiped from it. That wiping of the iPad occurred at 10:59 p.m. on September 2: approximately 9 hours after Amato was explicitly instructed by Abbott not to further tamper with company-issued devices.

107. Upon receipt of Amato's company-issued phone, Abbott's forensic investigation revealed that no user-generated activity existed on the phone after February 2025, indicating that Amato, without permission from Abbott, purchased a different cell phone and used it to conduct company business in violation of Abbott's policies.

108. Abbott's investigation has identified additional gaps in the information available from devices and accounts used by Amato, including the absence of certain expected data and cloud-based information.

109. Specifically, and despite requests from Abbott, Amato has not provided all information and access credentials necessary to investigate those issues and determine the location, preservation status, and disposition of Abbott's information. Amato has refused to provide the credentials needed to access Abbott-issued devices to determine the full scope of his use of them. Other devices that Amato *did* return to Abbott were "factory reset" so as to remove all user data.

110. Abbott's forensic investigation to date has also revealed that Amato connected a series of USB storage devices to his company-issued laptop in May 2026 and accessed files stored on that device while doing so. Those USB storage devices have not been returned to Abbott, nor were they ever previously disclosed to Abbott.

111. Simply put, Defendants have not provided assurances sufficient to eliminate the risk that Abbott's information remains in Amato's or Impulse's possession, custody, or control.

**THREATENED MISUSE OF CONFIDENTIAL INFORMATION AND IRREPARABLE HARM**

112. Amato's knowledge of Abbott's confidential commercial, strategic, customer, personnel, and operational information cannot simply be compartmentalized while he performs overlapping market-expansion duties for Impulse.

113. Abbott seeks narrowly tailored relief preventing misuse of their property and information, enforcing valid contractual obligations, preserving evidence, and preventing improper solicitation or interference.

114. Amato has not provided information requested by Abbott that is necessary to evaluate his new position, complete forensic review of company devices, and assess the potential use, retention, or disclosure of Abbott's confidential information.

115. Unauthorized use or disclosure of Abbott's confidential information would cause harm that is difficult to quantify, including loss of secrecy, competitive advantage, customer accounts and relationships, customer goodwill, market share, future CRM business opportunities, opportunities to recruit and retain talented employees, strategic lead time, and opportunities to increase sales of other products.

116. Once confidential information is disclosed to a competitor or used to shape competitive strategy, its secrecy and value cannot readily be restored through monetary relief alone.

117. Loss of access to customers, trained CRM personnel, market opportunities, and business goodwill would cause long-term injury extending beyond immediate lost revenue.

118. Defendants' conduct and the unresolved forensic issues create an immediate need for preservation, return, inspection, and targeted injunctive relief.

119. Section 11(d) confirms that "ABBOTT will face irreparable injury which may not be reasonably possible to calculate in dollar terms" and that "ABBOTT shall be entitled to injunctions enjoining such breach or threatened breach" by Amato or persons or entities acting for or with him.

**COUNT I**
**BREACH OF CONTRACT**
**(AGAINST AMATO)**

120. Abbott repeats and realleges paragraphs 1 through 119 as if fully set forth herein.

121. The Employee Agreement is a valid and enforceable contract between Amato and Abbott.

122. Abbott performed all obligations required under the Employee Agreement or was excused from further performance.

123. Amato has breached or threatens to breach the Employee Agreement by, among other things:

a. retaining, transmitting, using, or failing to return Confidential Information belonging to or lawfully possessed by Abbott;

b. failing to return property owned by or returnable to Abbott;

c. failing to provide the information needed or requested for Abbott to conduct a reasonable evaluation of the Impulse position as required by Section 13(c);

d. taking action that might reasonably be construed as violating Sections 9 or 10 without first seeking the clarification required by Section 13(d);

e. upon information and belief, initiating litigation challenging Sections 9 and 10 without first seeking the written resolution required by Section 13(d);

f. accepting the Vice President of Market Expansion position and providing services to Impulse, a Competing Business, that are the same as or similar in function or purpose to services Amato provided Abbott during his final two years of employment, in violation of Section 9(a)(i);

g. accepting the position and providing services to Impulse that are likely to result

in the use or disclosure of Confidential Information, notwithstanding an undertaking to the contrary, in violation of Section 9(a)(ii).

124. Amato's breaches have caused and threaten to cause Abbott damages, loss of contractual rights, loss of confidential information, loss of customer and employee goodwill, loss of business opportunities, loss of market share, and irreparable injury.

125. Amato expressly acknowledged that these breaches and threatened breaches would cause irreparable injury that may not reasonably be calculable in dollars and agreed that Abbott and its covered affiliates would be entitled to injunctions.

126. Abbott is entitled to temporary, preliminary, and permanent injunctive relief, damages, specific performance, return of property, extension of the applicable restricted periods, attorneys' fees, costs, expenses, and other relief authorized by Section 11 and applicable law.

## COUNT II
## BREACH OF FIDUCIARY DUTY/DUTY OF LOYALTY
## (AGAINST AMATO)

127. Abbott repeats and realleges preceding paragraphs 1 through 119 as if fully set forth herein. This cause of action is not based on the misappropriation of any trade secrets. This claim arises from conduct that is separate and distinct from any alleged acquisition, use, or disclosure of trade secrets, and would be actionable even in the absence of any trade secret allegation.

128. As a senior Abbott employee and executive, Amato owed Abbott duties of loyalty and confidentiality during his employment.

129. Those duties included obligations not to compete with Abbott while employed, divert Abbott's business or recruiting opportunities, misuse Abbott's resources or confidential information for another enterprise, or act for a competitor's benefit in matters connected to his employment.

130. While still employed, Amato breached those duties by, among other things:

a. assisting Impulse with recruiting or market-expansion activity and diverting a potential Abbott candidate to Impulse;

b. using Abbott's systems, time, access, information, or relationships to advance his transition to Impulse;

c. concealing the status or timing of his departure while Abbott made succession-planning decisions; and

d. engaging in other conduct for Impulse's benefit that conflicted with Abbott's interests.

131. Amato's breaches caused injury to Abbott and unjustly benefited Amato and Impulse.

132. Abbott is entitled to damages, equitable relief, disgorgement or forfeiture of compensation during the period of disloyalty as permitted by law, and all other available relief.

## COUNT III
## MISAPPROPRIATION OF TRADE SECRETS
## ILLINOIS TRADE SECRETS ACT, 765 ILCS 1065/1 ET SEQ
## (AGAINST ALL DEFENDANTS)

133. Abbott repeats and realleges preceding paragraphs 1 through 119 as if fully set forth herein.

134. Abbott owns or lawfully possesses trade secrets relating to its CRM business.

135. The asserted trade secrets derive actual or potential independent economic value from not being generally known and not being readily ascertainable by proper means by persons who could obtain economic value from their disclosure or use.

136. Abbott uses reasonable measures to maintain the secrecy of the asserted trade secrets, including restricted access, password-protected systems, business-need access controls,

information-security policies and monitoring, employee confidentiality obligations, and bringing enforcement actions to protect its trade secrets.

137. Amato acquired the trade secrets under circumstances imposing duties to maintain their secrecy and limit their use.

138. Amato acquired, retained, disclosed, used, or threatens to use the trade secrets without Abbott's consent through the forwarding of Abbott's confidential and trade secret information to his personal email account.

139. Impulse knew or had reason to know that any Abbott trade secrets received from Amato were acquired through improper means or disclosed in violation of duties because, among other things, Impulse received Amato's Employee Agreement before employing him.

140. Defendants' misappropriation is actual or threatened and is causing or will cause irreparable harm to Abbott.

141. Defendants' conduct was willful and malicious.

142. Abbott is entitled to injunctive relief under 765 ILCS 1065/3, damages under 765 ILCS 1065/4, exemplary damages and attorneys' fees where authorized, and all other relief.

**COUNT IV**
**MISAPPROPRIATION OF TRADE SECRETS**
**DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 ET SEQ.**
**(AGAINST ALL DEFENDANTS)**

143. Abbott repeats and realleges preceding paragraphs 1 through 119 as if fully set forth herein.

144. Abbott owns or lawfully possesses the trade secrets identified in Count III.

145. Those trade secrets relate to products or services used in, or intended for use in, interstate or foreign commerce. Abbott manufactures and sells CRM products to physicians, hospitals, clinics, and other healthcare professionals and institutions in the United States.

146. Abbott took reasonable measures to keep the trade secrets secret.

147. The trade secrets derive actual or potential independent economic value from not being generally known and not being readily ascertainable through proper means.

148. Defendants acquired, disclosed, used, or threaten to use the trade secrets through improper means or under circumstances giving rise to duties to maintain secrecy and limit use.

149. Defendants knew or had reason to know that their conduct was unauthorized.

150. Defendants' conduct constitutes actual or threatened misappropriation under 18 U.S.C. §§ 1836 and 1839.

151. Defendants' conduct was willful and malicious.

152. Abbott is entitled to injunctive relief, damages, exemplary damages and attorneys' fees where authorized, and all other relief available under 18 U.S.C. § 1836.

153. Any employment-related injunction sought under the DTSA will be based on evidence of threatened misappropriation and will not prevent Amato from entering an employment relationship merely because of information he knows.

## COUNT V
## TORTIOUS INTERFERENCE WITH CONTRACT
## (AGAINST IMPULSE)

154. Abbott repeats and realleges preceding paragraphs 1 through 119 as if fully set forth herein. This cause of action is not based on the misappropriation of any trade secrets. This claim arises from conduct that is separate and distinct from any alleged acquisition, use, or disclosure of trade secrets, and would be actionable even in the absence of any trade secret allegation.

155. The Employee Agreement between Amato and Abbott is a valid and enforceable contract.

156. Upon information and belief, Impulse was fully aware of the Employee Agreement and its restrictions no later than August 3, 2026, when Amato transmitted the Employee Agreement to Ryan Walters during the recruitment process and stated, "Attached is my EA with Abbott. Let me know if you need anything else."

157. Despite having knowledge of the Employee Agreement, Impulse intentionally induced, encouraged, permitted, facilitated, and accepted the benefit of Amato's breaches by, among other things:

a. recruiting and hiring Amato for the Vice President of Market Expansion position;

b. assigning or permitting Amato to perform services that are the same as or similar in function or purpose to the services he provided during his final two years of employment with Abbott;

c. assigning or permitting Amato to perform services likely to result in the use or disclosure of Confidential Information;

d. failing to require compliance with the Employee Agreement's notice, evaluation, and cooperation provisions; and

e. otherwise encouraging, permitting, assisting, or benefiting from conduct that violated the Employee Agreement.

158. Upon information and belief, Impulse's interference was intentional, malicious, unjustified, and accomplished through wrongful means, including knowingly employing Amato in a role prohibited by the Employee Agreement after receiving actual notice of its restrictions and assisting, facilitating, or benefiting from Amato's ongoing contractual breaches.

159. As a direct and proximate result of Impulse's interference, Abbott has suffered and will continue to suffer substantial injuries, including loss of contractual rights and protections, loss

of confidential information, loss of customer and employee goodwill, loss of business opportunities, loss of competitive advantage, and other damages.

160. Impulse's conduct has caused and threatens irreparable harm for which there is no adequate remedy at law.

161. Accordingly, Abbott is entitled to temporary, preliminary, and permanent injunctive relief, compensatory damages, consequential damages, punitive damages where permitted, attorneys' fees and costs where authorized, and all other relief available under law and equity.

**COUNT VI**
**UNFAIR COMPETITION**
**(AGAINST ALL DEFENDANTS)**

162. Abbott repeats and realleges preceding paragraphs 1 through 119 as if fully set forth herein.

163. This cause of action is not based on the misappropriation of any trade secrets. This claim arises from conduct that is separate and distinct from any alleged acquisition, use, or disclosure of trade secrets, and would be actionable even in the absence of any trade secret allegation.

164. Through the conduct described above, Defendants sought to obtain an unfair competitive advantage by benefiting from confidential information, strategic business information, employee and candidate relationships, and other competitive assets belonging to Abbott.

165. Defendants knowingly and intentionally engaged in conduct designed to benefit Impulse at Abbott's expense, including, upon information and belief:

a. recruiting and employing Amato despite actual notice of the Employee Agreement;

b. inducing, facilitating, encouraging, or benefiting from Amato's breaches of contractual and common-law obligations;

c. using or attempting to use Abbott's goodwill, customer relationships, recruiting opportunities, business contacts, training investment, and market knowledge for Impulse's competitive advantage; and

d. engaging in other conduct intended to circumvent or undermine Abbott's contractual and competitive protections.

166. Defendants undertook the foregoing conduct knowingly, intentionally, willfully, and with conscious disregard for Abbott's rights.

167. Defendants' conduct constitutes unfair competition and has provided, or threatens to provide, Defendants with competitive advantages they could not have obtained through fair competition and lawful means alone.

168. As a direct and proximate result of Defendants' conduct, Abbott has suffered and will continue to suffer injury, including loss of contractual protections, loss of customer and employee goodwill, loss of business opportunities, loss of competitive advantage, loss of confidential information, disruption of recruiting efforts, and other damages.

169. Defendants' conduct threatens continuing and irreparable harm that cannot be fully remedied through monetary damages alone.

170. Unless restrained by this Court, Defendants will continue to obtain the benefits of their unfair conduct and continue to injure Abbott.

171. Accordingly, Abbott is entitled to temporary, preliminary, and permanent injunctive relief, compensatory damages, consequential damages, punitive damages where

permitted by law, attorneys' fees and costs where authorized, and such other relief as the Court deems just and proper.

**COUNT VII**
**DECLARATORY JUDGMENT**
**28 U.S.C. §§ 2201 AND 2202**
**(AGAINST ALL DEFENDANTS)**

172. Abbott repeats and realleges preceding paragraphs 1 through 119 as if fully set forth herein.

173. The Employee Agreement is a valid and enforceable agreement between Amato and Abbott.

174. St. Jude is a covered affiliate and intended beneficiary entitled to enforce the Employee Agreement.

175. The Employee Agreement was supported by Amato's employment, the parties' mutual promises and covenants, and Amato's receipt of access to Confidential Information, customers, business contacts, and training through his employment with Abbott.

176. Section 15 is valid and enforceable and provides that Illinois law governs the Employee Agreement's construction and enforceability and the parties' relationship.

177. Section 16 is valid and enforceable and provides that claims arising out of or relating to the Employee Agreement shall be litigated in Lake County, Illinois state court or the Northern District of Illinois.

178. Section 13 is valid and enforceable and required Amato to notify Abbott of his intended or actual subsequent employer, provide information needed or requested for Abbott to conduct a reasonable evaluation of the Impulse position, seek clarification before taking action that might reasonably be construed as violating Sections 9 or 10, and seek written resolution before initiating litigation challenging those restrictions.

179. Section 9 is valid and enforceable and applies to Amato's post-employment services for Impulse.

180. Impulse is a Competing Business within the meaning of the Employee Agreement.

181. Upon information and belief, Impulse is developing products that overlap with portions of Abbott's Cardiac Rhythm Management ("CRM") business. Publicly available information indicates that Impulse is developing a device that combines its Cardiac Contractility Modulation ("CCM") therapy with implantable cardioverter defibrillator ("ICD") functionality. Because ICDs are a core component of Abbott's CRM portfolio, Impulse's development efforts implicate markets in which Abbott competes and creates competitive overlap between Impulse's future product plans and Abbott's CRM business. As a result, the confidential information to which Amato had access, including information concerning Abbott's CRM strategy, product-development initiatives, commercialization plans, physician relationships, reimbursement strategies, competitive positioning, and future business opportunities, remains competitively sensitive and valuable.

182. Amato's Vice President of Market Expansion role and services for Impulse fall within Section 9(a)(i) because they are the same as or similar in function or purpose to services he provided Abbott during his final two years of employment.

183. Amato's role and services for Impulse independently fall within Section 9(a)(ii) because they are likely to result in the use or disclosure of Confidential Information, notwithstanding any undertaking to the contrary.

184. Amato and Impulse contend that Sections 9, 10, 13, 15, and 16 are invalid or unenforceable and have sought relief in California preventing Abbott and its affiliates, including St. Jude, from enforcing them.

185. A substantial and immediate controversy exists concerning the parties' respective rights and obligations.

186. Abbott is entitled to declarations that Sections 9, 13, 15, and 16 are valid and enforceable, that Impulse is a Competing Business, that Amato's role and services violate Sections 9(a)(i) and 9(a)(ii), that Amato failed to comply with Section 13, and that Abbott may enforce the Employee Agreement according to its terms.

## PRAYER FOR RELIEF

WHEREFORE, Abbott Laboratories and St. Jude Medical S.C., Inc. respectfully request judgment in their favor and against Defendants Chad Amato and Impulse Dynamics USA, Inc., and an Order:

A. Temporarily, preliminarily, and permanently enjoin Defendants and all persons acting in concert with them from using, disclosing, transmitting, retaining, copying, destroying, or otherwise exploiting Abbott's confidential, proprietary, and trade-secret information;

B. Temporarily, preliminarily, and permanently enjoin Amato from providing services to Impulse that violate Section 9 of the Employee Agreement, including Sections 9(a)(i) and 9(a)(ii), for the applicable restricted period and any extension authorized by Section 11(c);

C. Temporarily, preliminarily, and permanently enjoin Amato from soliciting Abbott employees, independent contractors, and partners in violation of section 10 of the Employee Agreement for the applicable restricted period and any extension period authorized by 11(c);

D. Temporarily, preliminarily, and permanently enjoin Impulse from inducing, encouraging, facilitating, assisting, or benefiting from Amato's violations of the Employee Agreement;

E. Order Defendants and all persons acting in concert with them to return to Abbott all originals and copies of documents, files, records, devices, accounts, repositories, and other materials containing or relating to Abbott's confidential, proprietary, and trade secret information;

F. Order Defendants and all persons acting in concert with them to preserve all documents, data, communications, devices, accounts, and electronically stored

information relevant to this action and to make such materials available for inspection and forensic examination pursuant to a protocol approved by the Court;

G. Award Abbott actual, incidental, compensatory, consequential, and other damages to be proven at trial;

H. Order disgorgement, forfeiture, restitution, or an accounting of compensation, benefits, revenues, opportunities, or other gains obtained through Defendants' wrongful conduct to the extent permitted by law;

I. Award exemplary or punitive damages where permitted and supported by the evidence;

J. Award attorneys' fees, costs, and expenses as authorized by the Employee Agreement, statute, or other law; and

K. Grant such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all claims so triable.

**DATED: SEPTEMBER 21, 2026**

Respectfully submitted,

**ABBOTT LABORATORIES** and **ST. JUDE MEDICAL S.C., INC.**

By: *<u>/s/ Kevin J. Mahoney</u>*
One of Their Attorneys

Kevin J. Mahoney
Seyfarth Shaw LLP
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606
kmahoney@seyfarth.com
Telephone: (312) 460-5000
Facsimile: (312) 460-7000

*Attorneys for Plaintiffs Abbott Laboratories and St. Jude Medical S.C., Inc.*